IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


LAURA A. CARPENTER AND
LAURA CARPENTER FINE ART, INC.,

       Plaintiffs/Appellants/Cross-Appellees,

vs.                             No. CIV 1:97-1197 BB/LCS

GINNY L. WILLIAMS,

       Defendant/Appellee/Cross-Appellant.

## MAGISTRATE JUDGES'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C.Sec.636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten-day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.

## PROPOSED FINDINGS

This matter came before the Court on cross-appeals from a judgment entered in adversary proceeding No. 96-1082 M by the United States Bankruptcy Court for the District of New Mexico, in which Defendant/Appellee/Cross-Appellant Ginny L. Williams ("Williams") asserted several claims of debt and fraud against

1

Plaintiffs/Appellants/Cross-Appellees Laura L. Carpenter ("Carpenter") and Laura Carpenter Fine Art, Incorporated ("LCFA"). Carpenter and LCFA objected to Williams' claims, and filed counterclaims for breach of contract, equitable subordination, breach of the covenant of good faith and fair dealing, promissory estoppel, intentional or negligent misrepresentation, *quantum meruit*, unjust enrichment, *prima facie* tort and fraudulent transfer.

The Bankruptcy Court ruled in Williams' favor on approximately $1.8 million of her claims. The Court also ruled in Carpenter's favor on part of her promissory estoppel counterclaim, awarding her approximately $20,900, and on her breach of contract claim, decreeing specific performance of the contract which provided that she receive 50% of the profits upon its performance. The parties have appealed all of these rulings, as well as most of the claims and counterclaims the Bankruptcy Court denied. For the reasons set forth in these proposed findings and recommended disposition, I recommend the judgment of the Bankruptcy Court be **AFFIRMED in part, REVERSED in part and REMANDED.**

### Issues Presented on Appeal

1.) Whether Carpenter's using money provided by Williams for expenses different from those for which she requested funds constitutes fraud.

2.)  Whether the $1.57 million Williams provided to LCFA after November, 1993 was a loan or an equity investment.

3.)  If the $1.57 million was a loan, whether Williams was entitled to interest.

4.)  Whether Williams provided sufficient proof of her damages resulting from Carpenter's refusal to vacate the Brownell-Howland property.

5.)  Whether Carpenter provided sufficient proof of her damages resulting from improvements made to the Brownell-Howland property during her occupation.

6.)  Whether the Art Investment Company agreement was enforceable.

7.)  If the Art Investment Company agreement is enforceable, whether LCFA was entitled to be reimbursed its expenses for maintaining and storing artwork.

8.)  If the Art Investment Company agreement is enforceable, Whether Williams was entitled to reimbursement of the interest on a loan she procured to fund purchases, and if so, at what rate.

9.)  If the Art Investment Company is agreement is enforceable, whether Carpenter, Williams or both breached the agreement.

10.) If the Art Investment Company agreement is enforceable, and if Williams breached the agreement, whether specific performance was the appropriate remedy.

11.) Whether the April 7, 1994 Working Capital agreement is enforceable.

3

## Standard of Review

A Bankruptcy Court's findings of fact will not be disturbed on appeal unless they are clearly erroneous: however, its conclusions of law are reviewed *de novo*. *In re Unioil*, 948 F.2d 678, 681 (10th Cir. 1981).

## Background

Carpenter, through LCFA, owned and operated an art gallery in Santa Fe, New Mexico. In late 1991 she met Williams, a wealthy Denver art dealer and collector.  In 1992, Williams began providing substantial financial assistance to Carpenter and LCFA, while the parties discussed several joint venture and partnership possibilities, as well as how to account for the money Williams was providing.  The arrangements up to that time had been somewhat haphazard. For example, on three occasions, Williams provided Carpenter with money for one purpose, such as to purchase a particular painting or to pay the premiums on Carpenter's father's life insurance, but then learned later that Carpenter actually applied the funds she received to a different purpose, such as to purchase a different painting or to pay an LCFA expense.

In May, 1993 Williams bought the Brownell-Howland property in Santa Fe and Carpenter moved in with Williams' consent. (Carpenter and LCFA eventually spent approximately $166,000 on improvements to the property.) Carpenter thought that Williams was going to give

4

her the property as a gift, but Williams never transferred the title to her.

By December 1993 the parties agreed to convert the approximately $3.5 million Williams had provided to LCFA into an 87% ownership interest in the Corporation. (After that date, Williams provided LCFA with some $1.57 million more.) Williams also spent approximately $8 million on modern art which Carpenter had helped locate, negotiated the purchase, stored, and maintained in the gallery. The parties discussed possibly holding the art until its value increased, then selling it and dividing the profits equally after Williams' expenses were reimbursed.

In April 1994, after considerable pressure from their attorneys to formalize and organize their relationship, Carpenter and Williams executed two documents: the Art Investment Company agreement and the Working Capital agreement. The Art Investment Company agreement provided, *inter alia*, that Williams would purchase art and receive a bill of sale therefor, but would consign the artwork to LCFA. After holding the artwork for from one to five years, it would be sold, Williams would be reimbursed the cost of the purchase, and the parties would equally divide the remaining profits. The agreement did not specify whether it covered the artwork already purchased, nor did it address what would happen if the artwork were sold at a loss.

The Working Capital agreement provided, *inter alia*, that Williams' ownership interest in LCFA would be changed from 87% to 50%, and she would be given the title of Chief Financial Officer. It also provided that a plan would be adopted for eliminating LCFA's debts and payables, that Williams would provide ongoing financial support as necessary, and that Carpenter would have control, and manage the day to day operations, of LCFA. The agreement had no termination date. Both documents contained the sentence "The parties intend to be legally bound by this agreement."

In late 1994, the parties had a falling out. Williams brought suit in state court in Colorado, seeking a declaratory judgment that the Art Investment Company and Working Capital agreements were invalid. She also claimed that the approximately $1.57 million she provided to LCFA since late 1993 was a loan, not "financial support as needed" or capital investment, and demanded repayment with interest. In February 1995, she told Carpenter to vacate the Brownell-Howland property, but Carpenter refused to leave until August, 1997, after the trial court had entered judgment in the case. Williams eventually sold the property for a substantial loss.

In November 1995, Carpenter and LCFA filed for bankruptcy. Williams objected, claiming that she was entitled to the $380,000 Carpenter had spent on different purposes than what Carpenter had told her. She also claimed she was entitled to the $1.57 million

she had provided to LCFA in 1994, plus interest, that she was entitled to damages representing the Brownell-Howland property's loss in market value during the time Carpenter occupied the premises without her permission, as well as the loss of the rental value of the property during that time.

Carpenter and LCFA counterclaimed that Williams had breached both of the April 7, 1994 agreements. Under the Working Capital agreement, LCFA was entitled to the $1.57 million. Under the Art Investment Company agreement, Carpenter and LCFA were entitled to 50% of the difference between the current value and the original cost of that part of the Gallery's inventory Williams had purchased with Carpenter's help. Carpenter also claimed that Williams had promised to give her the Brownell-Howland property as a gift, and that the Court should decree specific performance of that gift. She claimed in the alternative that she should be reimbursed for the approximately $166,000 she and LCFA spent on improving the property.

The Bankruptcy Court ruled that Carpenter's applying $380,000 to purposes other than what she requested was not unusual in the parties dealings, and so did not constitute fraud. It held, however, that as to one approximately $29,900 claim, Carpenter's purchase of a different painting with part of the funds and paying gallery payables with the rest was a breach of the Art Investment Company agreement. It also ruled that the April 7, 1994 Working Capital agreement was unenforceable, and the approximately $1.57

million contributed by Williams after December, 1993 was a loan, but denied her claim for interest thereon. The court further ruled that Williams was not entitled to damages for either the diminution of market value or the loss of rent of the Brownell-Howland property because Williams' evidence on those issues came from a realtor, not an appraiser.

As to Carpenter's and LCFA's claims, the court held that the Art Investment agreement was enforceable and that Williams had breached the agreement when she brought suit alleging its invalidity. The court held that the agreement covered 125 pieces of art, and that Carpenter was entitled to 50% of the profits after the pieces were sold. It decreed that the parties should specifically perform the agreement, that is, retain the works and sell them after they have appreciated in value at some time in the future.

The Bankruptcy Court further ruled that Carpenter was not entitled to the Brownell-Howland property. As to her alternative claim, it ruled that she was not entitled to reimbursement of the $166,000 she and LCFA spent on improvements, because (with the exception of one $20,800 claim) it could not determine which amounts were paid by Carpenter and which were paid by LCFA. The parties appealed every ruling except the Bankruptcy Court's refusal

to equitably subordinate Williams' claims and its ruling that Carpenter was not entitled to  the Brownell-Howland property.[1]

**1.    The Bankruptcy Court's ruling, that Carpenter's occasionally using Williams' money for purposes other than what she originally requested did not constitute fraud, was correct.**

To commit fraud, one person must knowingly or recklessly, and with an intent to deceive, make a false representation, for the purpose of inducing another party to act, and the other party must rely on the misrepresentation to her detriment. *Matter of Estate of Gardner*, 845 P.2d 1247 (Ct.App.N.M.1992). The Bankruptcy Court found that Carpenter did not, at the time she requested money, intend to deceive Williams; instead, because of her often slipshod accounting, after requesting money from Williams, Carpenter would have to use her own funds, earmarked for a different purpose, for the purpose for which she had requested money from Williams.  She would then use Williams' money for the purpose for which her own funds were originally intended. Carpenter's actions do not evidence an intent to deceive at the time the money was requested. Williams' briefs do not even argue, much less cite evidence, to the

---

[1] LCFA attempts to raise another issue, whether Williams' obtaining title to the paintings from LCFA and canceling its debt to her constituted a fraudulent conveyance in violation of N.M.Stat. Ann. Sec. 56-10-18A(2). Because  this claim was not raised in the pleadings, this Court will not address it on appeal. *See Quillen v. International Playtex Inc.*, 789 F.2d 1041 (4th Cir. 1986).

contrary.  Accordingly, I recommend that the bankruptcy court's ruling on this point be **AFFIRMED**.[2]

**2.The Bankruptcy Court's finding, that the $1.57 million Williams provided to LCFA after November 1993 was a loan, was not clearly erroneous.**

The Bankruptcy Court noted that Williams treated the $1.57 million she advanced to LCFA after November 4, 1993 as loans for tax purposes and that LCFA initially characterized the money as "notes payable."  While Carpenter later instructed her accountant to change the characterization to equity, there is no evidence in the record that Williams agreed. LCFA presents some evidence that both Camilla Brown, LCFA's bookkeeper, and Blanton McDonald, Williams' accountant, had previously initially characterized advances as loans and later changed the characterization to capital contributions. Absent any evidence of Williams' acquiescence in this conduct, however, the trial court's finding that the $1.57 million was a loan is not clearly erroneous. *See Tankesley v. Thompson,* 469 S.E. 2d 853 (Ct. App. Ga. 1996) (The determining factor in whether a transfer of money is a gift or a loan is the

---

[2]While the Bankruptcy Court found that Carpenter's redirection of moneys was not fraudulent, it did find that, as to one $29,900 claim, her actions constituted a breach of the parties' Art Investment agreement. See discussion at pp.19-20. Carpenter contends that this finding was at least partially incorrect, but on review I find no clear error.

intent of the transferror.) I therefore recommend that the Bankruptcy Court be **AFFIRMED** on this point.

**3.The Bankruptcy Court's ruling that no interest was due on the $1.57 million loan was incorrect.**

The bankruptcy court found, and all of the parties agree, that there was no discussion, and accordingly no agreement, that interest would be due on the $1.57 million. This led the Bankruptcy Court to determine that the $1.57 million loan was interest-free. However, if the parties do not agree to a specified rate of interest, *see e.g. Skarda v. Davis*, 505 P.2d 1220 (N.M.1973) or if they do not agree that no interest shall be paid, *see e.g. Clovis v. Southwestern Pub. Serv. Co.*, 161 P.2d 878 (N.M.1945), the Court will impose interest at a rate up to the maximum fixed by state statute. See N.M. Stat. Ann. Sec. 56-8-3 (1996 Supp.). The Bankruptcy Court erred by considering the parties' failure *to discuss* interest to be the same as agreeing that no interest was to be paid. Accordingly, I recommend that the Bankruptcy Court's decision on this point be **REVERSED.**

Under N.M. Stat. Ann. Sec. 56-8-3 (1996 Supp.), the rate of interest to be charged cannot be more than 15%.  Interest is to be charged from the date Carpenter first refused to pay until Nov. 27, 1995, the date Carpenter and LCFA filed for bankruptcy. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946). Unfortunately, this Court cannot, based upon the record before it,

determine the date of Carpenter's refusal.  Williams contends in her brief in chief that Carpenter's refusal occurred on Dec. 31, 1993,(actually, 1994) the date Williams filed her complaint in the Colorado Lawsuit. However, the filing of a complaint by a plaintiff does not, by itself, establish a defendant's refusal to pay. Accordingly, I recommend that this case be **REMANDED** to the Bankruptcy Court to determine the interest rate, as well as the date from which interest began to run.

**4.The Bankruptcy Court's finding that Williams failed to establish diminution in value or loss of rent on the Brownell-Holland property was not clearly erroneous.**

For her claim that the Brownell-Holland property lost sale value and that she lost rental income during the time Carpenter refused to vacate the property, Williams offered the uncontradicted testimony of a realtor.  However, because the witness was not an appraiser, the court did not give the  testimony sufficient weight to support a damages award. As it is not clear error for a fact finder to reject expert opinion evidence, even if uncontradicted, *see Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627-28 (1944), I recommend that the Bankruptcy Court's finding on this issue be **AFFIRMED.**

**5.  The  Bankruptcy  Court's  ruling  that  Carpenter  was  not entitled to reimbursement of the expenditures on Brownell- Howland was correct.**

The Bankruptcy Court ruled that Carpenter established all but one  of  the  elements  of  a  promissory  estoppel  claim  as  to  the renovations she made to the Brownell-Howland property: that she was the one who paid for the renovations.  Since LCFA did not make any claim,  and  the  evidence  (except  as  to  $20,900  of  the  $166,000 claimed) was equivocal, the Bankruptcy Court ruled that Carpenter had not established that she individually incurred the damages and thus it denied her claim.

Based  on  a  review  of  the  evidence  cited  by  the  parties, particularly trial exhibit 800 and Carpenter's somewhat equivocal testimony on the point, this Court is of the opinion that the Bankruptcy Court's finding that Carpenter's evidence on this point did not preponderate was not clearly erroneous.  Accordingly, its ruling that the claim should be denied is correct and I recommend that it be **AFFIRMED**.[3]

**6.The  Bankruptcy  Court's  ruling  that  the  April  7,  1994  Art Investment agreement was enforceable was correct.**

The  Bankruptcy  Court  ruled  that  the  April  7,  1994  Art Investment agreement -  whereby Williams would provide the funds,

---

[3] Williams has appealed the Bankruptcy Court's finding that Carpenter's evidence was sufficient as to the $20,800 claim. I find no clear error in this finding and recommend it be affirmed.

Carpenter would find, negotiate for and purchase the artworks, LCFA would show and maintain the pieces, and the parties would hold the paintings until they appreciated in value, sell them, pay back Williams and equally divide the profit - was enforceable.

Williams attacks the document on several grounds. First she contends that, despite signing the contract directly under the statement "the parties intend to be legally bound by this agreement", she thought the document was merely a letter of intent. Therefore, in her view, there was no meeting of the minds and a legally binding document was not created. It is well settled, however, that a  written manifestation of intent controls over a subjective lack of intent. *See Lucy v. Zehmer*, 84 S.E.2d 516, 522 (1954); see *generally, Higgins v. Cauhape,* 261 P. 813 (N.M. 1927).

Next, she contends that the parties failed to reach agreement on three material terms: 1) which art was covered by the agreement, 2) whether the interest on a loan Williams had obtained in order to fund more purchases would be paid from gross receipts, before the net profits were determined, or would be paid solely by Williams out of her share of the net profits, and  3) how long the agreement would last.  However, none of these arguments is persuasive.

As to the first term, Williams makes numerous arguments on pages 21 - 25 of her brief in chief disputing whether some of the 125 pieces actually should have been included in the Art Investment Company agreement, finally concluding that "the Bankruptcy Court's

finding that 125 works of art are included in an art investment agreement is clearly erroneous when all of the evidence is considered." However, she cites to no legal authority to support her implicit premise that a mere dispute about to which items a contract provision applies renders the contract provision itself unenforceable. As long as the contract provides standards to allow a court to determine to which property it applies, it is sufficiently definite to be enforceable. *See generally, Gilroy v. White Eagle Oil Co.,* 201 F.2d 113(10th Cir. 1952). In the present case, the Bankruptcy Court found the contract and the parties' conduct provided sufficient guidance to allow it to determine that 125 pieces of art were subject to the Art Investment Company agreement. Williams' disagreement about how the Bankruptcy Court applied the standards does not establish that the contract lacks sufficient standards to be enforceable.

As to the second term, the contract evidences a joint intent that the interest on Williams' loan be paid before net profits are determined and then divided equally. Williams correctly points out that the parties continue to dispute the meaning of the contractual language. As with her previous contention, however, the mere fact that a dispute has arisen about the meaning of a contract term after the contract has been signed is insufficient to establish that there never was a meeting of the minds at the time of contracting; were this not so, ambiguity would be a complete

15

defense in a breach of contract claim. *Langer v. Lemke et al.,* 49 N.W.2d 641 (N.D. 1951).

As to the third term, the contract evidences the intent that it continue until the last painting subject to the agreement has been sold. Though Williams correctly points out that the length of the agreement is indefinite, she once again provides no legal authority to support her premise that indefiniteness as to time renders a contract *per se* unenforceable. As indefiniteness as to time is a common feature of many contracts, *see e.g., Continental Airlines, Inc. v. Keenan,* 731 P.2d 708 (Colo. 1987)(hiring for an indefinite time period creates an at-will employment contract), I find no error in the Bankruptcy Court's ruling on this point.

Next, Williams contends that the Art Investment agreement is unenforceable because there was no consideration. Conceding that Williams brought capital into the arrangement and that Carpenter provided the use of LCFA's  facilities, plus her labor and her expertise, Williams contends that Carpenter's contributions do not constitute consideration for the agreement because she was already being compensated for them through the cash advances Williams had made to LCFA. Williams assumes that Carpenter's draw from LCFA was compensation for providing the very services which constituted the consideration for the Art Investment agreement. Even were this assumption true (and Williams does not cite to any evidence in the record that the compensation Carpenter received from LCFA was for

the same services she performed pursuant to the art investment agreement) it would not mean that the contract was without consideration; rather it would mean that LCFA might conceivably have a claim against Carpenter for the compensation she drew from LCFA.

Finally, Williams contends that no enforceable agreement was formed because a condition precedent, consignment of the artwork to LCFA, never occurred due to the parties' failure to execute Carpenter's proposed written consignment agreement. As the Art Investment agreement does not require a written consignment agreement, the failure to execute a written agreement is not dispositive of this issue. The real issue is whether the facts as set out in the record establish that a consignment actually occurred. In a consignment, the title to the goods remains in the principal, who reserves the right to take back the goods. Possession passes to the consignee, who is liable to the principal not for the price of the goods, but rather to account for the proceeds when the goods are sold. *In re Gillingham*, 150 B.R. 907 (W.D. Pa. 1993), citing *Tax Review Board of the City of Philadelphia v. Elster & Prager,* 178 A.2d 611 (Pa. 1962). By this definition, the Art Investment agreement is itself a consignment agreement, so that the inclusion of the word "consignment" in the document does not create an additional term. Accordingly, the execution of a written consignment agreement was not a condition

precedent to the enforceability of the Art Investment agreement.

Finding no error in the Bankruptcy Court's ruling that the April 7, 1994 Art Investment agreement is enforceable, I recommend that its ruling on this issue be **AFFIRMED.**

**7.The Bankruptcy Court's ruling that Carpenter was not entitled to reimbursement for the cost of maintaining and storing the artworks was correct.**

The Art Investment Company agreement provided that, for at least the first year, LCFA would pay the expenses related to shipping, storing, insuring and selling the artwork. After that, Carpenter individually would assume those expenses. LCFA asserts that it received nothing in return for assuming these obligations, which resulted in expenses of $668,000. It contends that Carpenter and Williams were unjustly enriched.

Since at the time the contract was signed LCFA could act only through Carpenter, its director, its remedy for her obligating the corporation to perform a contract which would benefit her personally, would be a conflict of interest claim against her. To the extent that the Bankruptcy Court's denial of reimbursement of these expenses to Carpenter can be construed as a denial to LCFA as well, its ruling is correct and I recommend that it be **AFFIRMED.**

18

**8.The Bankruptcy Court's ruling that Williams was entitled to be reimbursed for the interest on the Women's Bank loan prior to the equal division of profits from the sale of artwork was correct; however, its finding that the applicable interest rate was 7% was clearly erroneous.**

The Bankruptcy Court found that the Art Investment Company agreement was ambiguous regarding whether the interest on the loan Williams obtained from Women's Bank in order to purchase paintings for the Art Investment Company would be paid out of the gross receipts of the sales, or out of Williams' share of the net profits.  It determined the first scenario was the likelier interpretation.  Carpenter contends that the parties in fact believed that Williams was to pay the interest out of her share of the net profits, citing as support Williams' accountant's lack of objection when Carpenter failed to reimburse her for the interest before dividing the profits from the sale of a painting.

The agreement provides: "When artwork is sold, GW to receive purchase price of artwork back, with initial funds going to repay GW's $2 million loan and interest at the Women's Bank in Denver. GW and LC to split profit evenly."  The only ambiguity in this provision is whether the $2 million loan and interest were to be paid out of the proceeds of sales only of the artwork purchased with loan money, or from the proceeds of any artwork purchased pursuant to the Art Investment Company agreement. Regardless of

this ambiguity, however, that the principal *and* interest were to be paid prior to dividing the profits is clear. As Williams' accountants' failure to object could well have been because the picture Carpenter sold was not purchased with loan proceeds, it is not sufficient evidence, particularly when combined with the language of the agreement, to establish that the Bankruptcy Court's interpretation of the clause was erroneous. Accordingly, I recommend that that part of the opinion be **AFFIRMED.**

As to the rate of interest, however, the Bankruptcy Court clearly erred in finding that the parties agreed that Williams would receive a rate of seven percent. Exhibit 333 demonstrates that the seven percent figure was a compromise offer, which Carpenter rejected, and that the actual rate of the loan, at the time offer was made, had risen to 8.5 percent. Because it appears that the interest rate was variable and the record is incomplete, I recommend this case be **REVERSED and REMANDED** so that the Bankruptcy Court can determine  the applicable interest rates in effect during the life of the loan.

**9.The Bankruptcy Court's ruling that Williams breached the Art Investment agreement was correct.**

The Bankruptcy Court held that Williams breached the Art Investment Company agreement when she sought a declaratory judgment that no legally enforceable agreement existed.  Williams does not dispute that this would constitute a breach; rather, she contends

20

that because Carpenter had herself previously breached the contract on three occasions, Williams' repudiation of the agreement does not subject her to liability.  Williams points out that the Bankruptcy Court ruled that Carpenter twice breached the Art Investment Company agreement: once when she applied to LCFA expenses some $29,900 Williams provided for the purchase of artwork pursuant to the agreement, and again when, after selling a painting, Carpenter refused to reimburse Williams for the interest on a loan Williams obtained to fund art purchases. (In her brief in chief,Williams points out that on another occasion, not mentioned by the Bankruptcy Court, Carpenter sold a painting covered by the agreement and subsequently refused to reimburse her for the interest.) The issue is whether these breaches justified or excused Williams' repudiation.

Under New Mexico law, it is true that a party's antecedent breach will excuse the other party's performance, but "the breach must be material and substantial, going to the essence of the agreement." *Bank of New Mexico v. Northwest Power Products Inc.*, 646 P.2d 280 (Ct.App.N.M.1980).  In determining whether Carpenter's breaches were material and substantial, the general rule is that where a contract is made up of several distinct and similar acts to be separately and successively performed, the failure to perform the act on one or two occasions is not a substantial and material breach if: 1) the breaches can be fully compensated in damages, and

21

2) the breaching party's conduct suggests that it still wants to perform the contract. *Lewis v. New York Life Insurance Co., Inc.,* 181 F. 433 (3d Cir. 1910); *see* generally, *McKinney v. Gannett Co.,* 660 F.Supp. 984 (D.N.M. 1981) *app.dism'd,* 694 F.2d 1240 (10th Cir. 1982), *on remand,* 660 F. Supp 1037 (D.N.M. 1983), *aff'd* 817 F.2d 659 (10th Cir. 1987). Carpenter's breach as to one of 125 paintings bought and her good faith mistake about whether interest should be paid from Williams' net profits, rather than gross receipts, fails to establish that she no longer wished to be bound by the contract. Since the Bankruptcy Court found that Williams could (and should) be fully compensated in damages for these breaches, the Bankruptcy Court's ruling that Carpenter's actions did not justify or excuse Williams' repudiation should, in my view, be **AFFIRMED.**

   **10.The Bankruptcy Court's decree that the parties specifically perform the Art Investment agreement was incorrect.**

   Both Williams and Carpenter agree that the Bankruptcy Court erred in decreeing specific performance of the Art Investment Company agreement. Williams contends that no remedy is required because she is not liable for her repudiation; as explained in Section 9, this contention is without merit.  Carpenter claims that the decree is erroneous because neither side requested equitable relief.  This Court, however, relies on the ground that there has been neither a showing by the parties, nor a finding by the Bankruptcy Court, that damages would not be an adequate remedy.

22

Specific performance cannot be decreed in the absence of such a finding. *United Nuclear Corp.v. General Atomic Co.*, 629 P.2d 231,328 (1980), *cert. denied,* 451 U.S. 901 (1981), *reh'g denied*, 452 U.S. 932 (1981). Nor does the record support this Court's making such a finding *sua sponte*: "To be adequate, the remedy at law must be as certain, prompt, complete and efficient to attain the ends of justice as a decree of specific performance." *City of Las Cruces v. El Paso Electric Co.*, 904 F.Supp. 1238, 1246 (D.N.M. 1995). While the difficulty in this case of evaluating the worth of the art inventory at the time of the breach will be substantial, it seems that such a procedure would actually prove even *more* prompt and efficient in resolving this dispute than forcing the parties to perform the Art Investment agreement according to its terms. This is particularly true considering, as the Bankruptcy Court pointed out, the animosity that has developed between the parties as a result of this litigation.   Accordingly, I recommend that the Bankruptcy Court's ruling on this issue be **REVERSED**, and that this issue be **REMANDED** to the Bankruptcy Court to determine the damages due Carpenter for Williams' breach.

**11.The Bankruptcy Court's ruling that the Working Capital agreement was unenforceable was correct.**

The Bankruptcy Court ruled that the other April 7, 1994 agreement, whereby Williams was to supply working capital on an "as needed" basis to the Gallery, was unenforceable because: 1) the

terms of the contract were too indefinite; and 2.) The Contract lacked consideration.  Contract terms must be sufficiently definite so that the court can determine whether they have been performed. *Van Heerden v. Total Petroleum Inc.*, 942 F.Supp. 468 (D.Colo 1996); *see also Sanders v. Freeland*, 325 P.2d 923 (N.M. 1958). In addition, a party's contractual obligation can only be enforced by one who herself has undertaken action she was not otherwise obligated to take. *See generally Romero v. Earl*, 810 P.2d 808 (N.M. 1991).

LCFA correctly points out that an indefinite working capital agreement was upheld in *Terrel v. Duke City Lumber Co.*, 524 P.2d 1021, 1045 (Ct. App. N.M. 1974),*aff'd* in *part and rev'd in part*, 540 P.2d 229 (1976):

> The "course of conduct" of the parties established not only the existence of a contract, but the terms as well. [Citations omitted.] The amount to be loaned was determined by the amount of working capital needed....Discussions between the parties indicate the contract would last as long as Terrel produced. The parties, by their conduct, "wrote" the contract. No more specificity is required.

Because the contractual language upheld in *Terrel* is similar to the language in the Working Capital agreement in the present case, this Court does not recommend affirming the Bankruptcy Court's ruling that the terms of the Working Capital agreement are too indefinite to be enforced. On the grounds that the contract lacked consideration, however, the Bankruptcy Court's ruling was correct.

Unlike the contract in *Terrel*, which provided for loans "as long as Terrel produced", the working capital agreement at issue here does not require Carpenter or LCFA to do anything at all in order to receive working capital, as needed, in perpetuity.  While the agreement provides that Williams will own 50% of LCFA, this ownership could not be consideration for her promise, since at the time of signing, she already owned 87% of the corporate stock. Accordingly, the terms of the agreement itself do not provide consideration.

LCFA contends that a third transaction on the same date as the Art Investment and the Working Capital agreements provided the consideration for both agreements.  It argues that LCFA actually had title to the 125 pieces of art that were under the Art Investment agreement which were worth approximately $12 million, but was in debt to Williams only for the 8 million she advanced to buy the paintings. It contends that Williams wanted it to transfer the title to the 125 paintings to her, which, after LCFA canceled its debt, would reduce its assets by some $4 million. It contends that it would not have done this but for Williams' agreeing to provide working capital as needed. Thus, the transfer of title to the paintings supplied the consideration for the working Capital agreement.

The problem with this argument is that what LCFA claims it "gave up" – the $4 million difference between the market value of

25

the paintings and the amount of its loan from Williams - was the profit from which Carpenter was already due to receive 50% pursuant to the Art Investment agreement. Under LCFA's scenario, if Williams did not agree to fund the gallery in perpetuity, LCFA would have been entitled to the entire $4 million in profits.  On the other hand, if she did agree to fund the gallery in perpetuity, Laura Carpenter would only be entitled to 50% of the $4 million of the profits, pursuant to the Art Investment Company agreement.

The Bankruptcy Court found more likely the scenario that the transfer of title to the paintings from LCFA to Williams was part of the Art Investment agreement, thus giving Williams more control over the decision of which paintings to sell. It found that the Working Capital agreement was separate, and that Williams' infusions of capital into the Gallery (and the promise that they would continue), were not the reason Carpenter entered into the Art Investment agreement with Williams. LCFA does not cite to any evidence in the record which suggests that the Bankruptcy Court's finding of what was the true scenario was clearly erroneous. Accordingly, its ruling that the Working Capital Agreement was unenforceable for lack of consideration was correct, and I recommend that it be **AFFIRMED**.

### RECOMMENDED DISPOSITION

26

For the above reasons, I recommend that the Bankruptcy Court's decision be **AFFIRMED** in all respects except the following: Instead of having the parties specifically perform the Art Investment Company agreement, I recommend that the case be **REMANDED** for a determination of damages due Carpenter pursuant to the terms of the agreement, with the value of the art inventory figured as of the date of Williams' breach, taking into account that Williams was entitled to be reimbursed the actual rates of interest on the Women's Bank loan. In addition, the Bankruptcy Court should determine an appropriate rate of interest of not more than 15%, and determine the date that interest began to accrue,in computing the damages due Williams on the $1.57 million loan she made to LCFA.

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**

27